United States District Court
For the Northern District of California

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

ALLISON LITT,

        Plaintiff,

    v.

PAUL REVERE LIFE INSURANCE
COMPANY, et al.,

        Defendants.
_____/

No. C 04-0561 PJH

**ORDER GRANTING DEFENDANTS'
MOTION FOR SUMMARY JUDGMENT**

Defendants' motion for summary judgment came on for hearing before this court on

March 8, 2006.  Plaintiff appeared by her counsel Gerard Engelskirchen, and defendants

appeared by their counsel Sean P. Nalty.  Having read the parties' papers and carefully

considered their arguments and the relevant legal authority, and good cause appearing, the

court hereby GRANTS the motion for the following reasons.

**BACKGROUND**

This is an action brought under § 502 of the Employee Retirement Income Security

Act of 1974 ("ERISA"), 29 U.S.C. § 1132(a)(1)(B), challenging the denial of payment of

long-term disability benefits under an "own occupation" disability benefits policy.  Plaintiff

Alison Litt was employed as an administrative assistant by Sazevich Faulkner Associates

("Sazevich"), an architectural firm, and was insured under defendant Sazevich Faulkner

Associates Group Long Term Disability Plan ("the Plan"), an employee welfare benefit plan

governed by ERISA.  Defendant Paul Revere Life Insurance Company ("Paul Revere")

issued the policy under which Sazevich was covered.  Defendant UnumProvident

Corporation ("UnumProvident") is Paul Revere's parent company.

**United States District Court**
For the Northern District of California

1     The Plan policy provides benefits whenever the employee is disabled from her own

2  occupation.  Under the policy, an employee is disabled if she meets the definition for either

3  Total Disability or Partial Disability, defined as follows:

> **TOTAL DISABILITY** or **TOTALLY DISABLED FROM THE EMPLOYEE'S
> OWN OCCUPATION** means that until he reaches the end of his Maximum
> Benefit Period, the Employee:
>
> 1.    is unable to perform the important duties of his own occupation on a
>       Full-time or part-time basis because of an Injury or Sickness that
>       started while insured under this Policy; and
>
> 2.    does not work at all; and
>
> 3.    is under Doctor's Care.
>
> If the employee is employed and is earning wages or a salary, he will be
> considered Partially Disabled as defined below.
>
> **PARTIAL DISABILITY** or **PARTIALLY DISABLED** means, as a result of
> Injury or Sickness, the Employee is unable to perform the important duties of
> his own occupation on a Full-time basis, but:
>
> 1.    he is able to perform one or more of the important duties of his own
>       occupation, or any other occupation, on a Full-time or part-time basis;
>       and
>
> 2.    he is earning less than 80% of his Prior Earnings.
>
> To qualify for the Own Occupation Benefit with Partial Disability, the
> Employee:
>
> 1.    must satisfy the Elimination Period with the required number of days of
>       Total and/or Partial Disability as defined in the Policy; and
>
> 2.    must be receiving Doctor's Care.  We will waive the Doctor's Care
>       Requirement if We receive written proof acceptable to us that further
>       Doctor's Care would be of no benefit to the Employee.

22  Administrative Record ("AR") at 567.

23     Plaintiff began working as an administrative assistant at Sazevich on October 1,

24  1995.  Her duties included reception, customer service, accounts payable, and data entry.

25  In April 1997, plaintiff began feeling a sharp, burning pain running down the little finger on

26  her left hand.  She reported that the pain would come and go, but that eventually she was

27  unable to open her hand.  AR 480-482.

28     Plaintiff stated that she first consulted Dr. Tracy A. Newkirk – a neurologist who is

United States District Court
For the Northern District of California

the medical director of the Newkirk Neurology METS Clinic – on May 15, 1997, and he

diagnosed an "industrial injury."  AR 481.  On May 23, 1997, Dr. Newkirk indicated that

plaintiff would be able to return to work on June 9, 1997.  AR 147.  Plaintiff applied for and

began receiving worker's compensation benefits.  She did not return to work at Sazevich

after May 15, 1997.

On May 28, 1997, Dr. Newkirk wrote the Claims Examiner for Kemper Insurance

("Kemper") – plaintiff's worker's compensation carrier – that plaintiff had "a postural strain

syndrome related to a work situation in which the keyboard is clearly very much too high,"

which "has led to increased forearm muscle tone called dystonia, aggravation of the

extensor tendons equivalent to tendonitis, and increased pain in her neck and shoulders,

equivalent to postural strain with a myofascial thoracic outlet syndrome."[1]  AR 149.

Dr. Newkirk also noted that plaintiff "already had ongoing neck and upper extremity

symptoms from previous trauma" and that she had previously been seen in his office on

November 4, 1994, because of an automobile accident that had occurred on October 25,

1994.  Her condition had "improved over time with extensive therapy" but she "never made

a full return to work."  As of early 1997, she was "frequently symptom-free, but was not well

tolerant of gripping, reaching, and other activities which require her to reach forward in front

of herself in the seated position."  AR 148-149.

Dr. Newkirk stated that plaintiff had an "aggravation of the structural changes in her

neck and upper thoracic area," but that she also had "overuse symptoms with dystonia in

the wrists, forearms, and arms, which is entirely unrelated to any previous injury."  As of

May 28, 1997, Dr. Newkirk was of the opinion that plaintiff could return to work doing

"limited duty, approximately half time."  He stated that plaintiff could do "some phone work

---

[1]  "Dystonia" is defined as "abnormality of muscle tone." Attorney's Illustrated Medical
Dictionary (1997). It is a "state of abnormal tonicity in any of the tissues resulting in impairment
of voluntary movement."  Stedman's Medical Dictionary (27th ed. 2000).   "Tendinitis" (or
"tendonitis") is an inflammation of a tendon. Id. "Thoracic outlet compression syndrom" is "[a]
group of ill-defined syndromes characterized by symptoms of pain and parasthesias in the
hand, neck, shoulder, or arms."  Merck Manual of Diagnosis and Therapy (17th ed. 1999).
"Pathogenesis is unknown." Id.

United States District Court
For the Northern District of California

1   and filing, but needs to change position frequently, and cannot work at a computer for more

2   than 15 to 20 minutes at a time." He indicated that an ergonomically correct work station

3   would "greatly accelerate her recovery," and that computer work should be limited "until

4   such time as the keyboard is lowered and other adjustments put in place." AR 148-149.

5           Beginning on May 28, 1997, plaintiff received physical therapy, which included "work

6   hardening" and upper quadrant exercise classes.[2] On June 3, 1997, Dr. Newkirk indicated

7   that plaintiff would be able to return to work on July 1, 1997. AR 153. On June 11, 1997,

8   he stated that plaintiff should be able to return to work on July 21, 1997 – four hours a day

9   the first week, and then only with a properly adjusted work station. AR 152. On June 23,

10  1997, he stated that plaintiff was "unable to work in any capacity at this time because of

11  arm pain," and again indicated that she should be able to return to work on July 21, 1997 –

12  depending on "the acquisition of a correctly appointed work station." AR 155.

13          On July 18, 1997, Dr. Newkirk reported that plaintiff "is now making progress,"

14  though "it is really very slow," noting that "[w]e have seen a similar situation occur in the

15  past when she had an automobile accident." He added that "her forearms are still involved

16  in a process that causes unusual sustained muscle contraction," which he stated was

17  "consistent with a diagnosis of acquired limb dystonia" – something that "happens in people

18  who use computer-based work stations that are improperly adjusted." He indicated that he

19  was adjusting her medication in an attempt to find an effective drug for her condition. He

20  concluded that plaintiff was still "highly symptomatic," but would try to return to work once

21  her work station was fully adjusted. AR 157-158.

22          On August 15, 1997, Dr. Newkirk reported to Kemper that plaintiff continued to make

23  progress – "It is slow, but now it is more promising." He indicated that he was still working

24  on adjusting plaintiff's medication. He stated that she could return to work on September 8,

25  1997, but only for four hours per day (though he noted that "the employer is not happy with

26  the idea of part time return"). AR 159. On September 3, 1997, he reported to Kemper that

27  _____

28          [2]  The records indicate that the physical therapy was also provided by the Newkirk
    Neurology METS Clinic.

4

United States District Court

For the Northern District of California

1   plaintiff's employer had denied return to work until plaintiff was ready for full time, and

2   stated that "through the rehab nurse we will be requesting work hardening, two hours for

3   two days, then four hours for two days, to assess her ability to return to work." AR 160.

4       During September 1997, plaintiff participated in a 12-hour work-hardening program

5   spread out over four sessions, at the Newkirk Neurology METS Clinic.  The purpose of the

6   program was to increase plaintiff's tolerance for the activities required of her job as an

7   administrative assistant in an architectural firm.  A Work Hardening Summary Report was

8   prepared by Julie Gardner, P.T.

9       Ms. Gardner stated that plaintiff had indicated a decrease in symptoms as of

10  September 1997, and that she was able to perform activities around the house that she

11  previously could not manage – vacuuming, making beds, cooking, washing dishes, and

12  doing laundry.  The report described plaintiff's duties as an administrative assistant, and

13  stated that since the bulk of plaintiff's duties involved use of the computer, the work-

14  conditioning tasks emphasized techniques that would reduce strain on the left hand and

15  arm.  At the end of the four-day period, plaintiff had not made enough progress to return to

16  her job, but she did show the potential to improve.  Ms. Gardner suggested that a home

17  work station be set up at plaintiff's father's house to allow plaintiff to practice some of the

18  exercises at home.  AR 211-216.

19      On September 27, 1997, Dr. Kirk stated that plaintiff could return to work on

20  November 3, 1997, "full time with correct ergonomic work station."  AR 143.  On September

21  29, 1997, he reported to Kemper that plaintiff had "definitely made progress with work

22  hardening, although not enough to return her to full time."  He was hopeful that "she will

23  make enough progress to return to full duty by early November."  He also noted that

24  plaintiff's employer "remains adamant that they will only accept her back full time."  AR 161.

25  On October 30, 1997, he stated that plaintiff could return to work on November 17, 1997,

26  eight hours per day – "number of hours on keyboard to be specified in 2 weeks."  AR 164.

27      On November 12, 1997, Dr. Newkirk reported to Kemper that plaintiff needed

28  additional physical therapy and vocational rehabilitation.  He noted, "Typing markedly

United States District Court
For the Northern District of California

1    increased pain in left hand but also neck pain plus further reduction in cervical ROM.

2    Hasn't been able to type for 4-5 days. . . . Exam shows neck and arms still flared."  He

3    recommended additional physical therapy "to recover from flare-up" and indicated that

4    physical therapy would be required for an additional two years "to treat flare-ups."  He

5    added, "Needs ergo work station."  He did not schedule a further appointment, but indicated

6    that she should visit "as needed."  AR 162.

7        On November 30, 1997, plaintiff submitted a claim to Paul Revere for long-term

8    disability benefits.  AR 256-261.  At that time, plaintiff was twenty-nine years old.  She

9    stated that she could no longer work as an administrative assistant at Sazevich because

10    "over a period of time . . . due to many repetitions at an improper work station, I have

11    tendinitis in my hand, dystonia, thoracic outlet syndrome and postural pain."  She stated

12    that she had never previously had problems with her hand or arm.  AR 261.

13        Plaintiff described her job duties at Sazevich as follows.  She stated that she worked

14    as a telephone receptionist 25 to 33 hours per week, which duty required her to "Pick-up

15    telephone on an 8 line system, screen and root calls, take all handwritten messages on

16    message pad (we do not have voice mail system)."  She also performed certain duties in

17    Accounts Payable and Receivable, for 10 to 25 hours per week.  This required her to

18    "[o]pen all AP/AR related bills, paper clip & tape bill to invoice, store in file, retrieve bills &

19    type & enter all data into Quickbooks system."  She also "[i]temize[d] invoices and cut

20    checks."  In addition, she spent up to 15 hours per week selecting supplies from brochures

21    and catalogues, preparing order forms, submitting orders by fax or telephone, following up

22    on late or wrong orders received, and putting away items throughout the office.  Finally, she

23    spent between 15 and 30 hours per week on "[d]ata entry and letter formats" and "[t]yping

24    & entering information on spreadsheets including a variety of typing assignments for

25    various projects.  AR 259.

26        Although plaintiff's description of her job duties suggests that she worked between

27    60 and 88 hours per week, plaintiff stated on her November 30, 2006, claim for benefits

28    that she worked 40 hours in a normal week at Sazevich.  She stated that her "work load

United States District Court
For the Northern District of California

1    was approximately 70% keyboard data entry & typing" and that "[e]very week was

2    different."[3]  In her opposition to the present motion, plaintiff explains that her duties varied

3    from week to week, and that she never claimed to have worked more than 40 hours a

4    week.

5        With the claim for benefits, plaintiff attached an "Attending Physician's Statement"

6    ("APS") signed by Dr. Newkirk and dated December 8, 1997.  Dr. Newkirk stated that he

7    had first seen plaintiff in his office on May 14, 1997, and that she was experiencing left arm

8    and hand pain, some pain in the right hand, upper back discomfort, tingling in the left hand,

9    multilevel joint stiffness in the neck and upper back, and positive upper limb tension signs.

10   He diagnosed plaintiff as suffering from problems of thoracic outlet syndrome, acquired

11   dystonia, and tendinitis.  In his opinion, plaintiff could not type at all or do other repetitive

12   hand activities.  He prescribed physical therapy, anti-inflammatories, and other medication,

13   and stated that he expected that she could resume her job duties in 1-3 months.  AR 257.

14       In a letter to the Kemper claims examiner dated December 17, 1997, Dr. Newkirk

15   stated, "unequivocally," that plaintiff "cannot do any keyboard activity whatsoever," and that

16   he did "not see that limit changing anytime in the near future."  He based that limitation on

17   the fact that plaintiff "still had symptoms ongoing from her work tolerance screening, done

18   several weeks ago."  He added that she was "able to push and pull frequently, as long as

19   the force is less than five pounds," that her "lift and carry limit" was "five pounds," and that

20   "the range is knee to shoulder level without overhead work whatsoever."  In addition,

21   "[r]epetitive gripping" was "precluded."

22       On January 20, 1998, Kemper advised plaintiff that her temporary disability benefits

23   were ending because Dr. Newkirk deemed her medical condition permanent and stationary

24   on November 12, 1997, and her employer had advised that it was unable to accommodate

25

26   _____

27       [3]  Defendants note that while plaintiff asserted that 70% of her job involved keyboard
     data entry or typing, she listed numerous job duties that do not involve data entry or typing.
     In addition, the physical therapist conducting the work hardening program reported that plaintiff
28   was not a touch typist, and that she typed only 21 words per minute.

United States District Court

For the Northern District of California

1   her with permanent modified/alternate work as outlined by Dr. Newkirk's report dated

2   December 17, 1997.  Kemper requested that plaintiff submit to an examination by a

3   Qualified Medical Evaluator in order to determine the existence and extent of permanent

4   limitations.  AR 175.[4]  On February 2, 1998, Kemper wrote plaintiff to confirm her

5   acceptance of Kemper's offer of vocational rehabilitation services.  AR 177.

6        Plaintiff started working in a retail sales job at Restoration Hardware in Corte Madera

7   on June 24, 1998.  Plaintiff's worker's compensation attorney advised Paul Revere that

8   plaintiff was working 32 hours as of June 29, 1998.  She later described her job at

9   Restoration Hardware as working "almost full time doing sales, customer service,

10  restocking of merchandise and typing."  She stated that the pain in her hand started to

11  increase, and that her work hours decreased, although it is not clear from her statement

12  whether the employer reduced her work hours for some reason, or whether she asked for

13  reduced hours because of the problems with her hand.  She "decided that a less strenuous

14  job would perhaps help in reducing my pain."  AR 481.

15       After nine months of investigation, Paul Revere approved plaintiff's claim on

16  September 21, 1998, finding plaintiff disabled as of May 15, 1997, and entitled to receive

17  benefits effective August 14, 1997, following exhaustion of the elimination period under the

18  policy.  Plaintiff's salary at the time of her claim was $2,017.00 per month, and she was

19  therefore entitled to a maximum benefit of $1,210.20 a month before offsets.

20       On April 28, 1999, Dr. Newkirk completed an APS, stating that he had treated

21  plaintiff from May 14, 1997, to April 28, 1999; that her prognosis was "stable," that she was

22  permanently totally disabled from her job, though not disabled from other work; and that

23  she would "never" be able to resume work without restrictions.  The restrictions listed were

24  "no typing, repetitive gripping, lifting, or reaching."  On the same form, plaintiff stated that

25  she was currently working part-time "occasionally on cash register, minimal re-stocking,

26  mainly speak with customers and sell the merchandise."  She also stated that at home, "I

27

28        [4] The record does not include any evidence of such an examination.

8

take daily walks, stretching & weight lifting with small weights." AR 032.

In September 1999, plaintiff reported to Paul Revere that she no longer worked at Restoration Hardware, and that she had started working at Nordstrom. She reported that she was able to work only part time because of her disability. She continued to work part-time at Nordstrom as a make-up salesperson until January 2000, when she was laid off. AR 266.

In mid-November 1999, plaintiff submitted a supplemental APS to Paul Revere, in which Dr. Newkirk stated that he had treated plaintiff from May 14, 1997, to November 8, 1999; that her prognosis was "stable;" that she was permanently totally disabled from her job, though not disabled from other work; and that she would "never" be able to resume work without restrictions. The restrictions listed were "no typing, repetitive gripping, lifting, or reaching." On the same form, plaintiff stated that she was currently working part-time "selling merchandise, minimal restocking & cash register, moving around constantly." She also stated that at home, "I take daily walks, stretching & weight lifting . . ." as before. AR 010.

In March 2000, plaintiff began working part-time at the Alexandria Gallery in Mill Valley. She described her duties as "jewelry sales and customer service, creating attractive jewelry displays, some data entry, and keeping accurate inventory records. She claimed, however, that "small finger grasping motions of showing rings and writing out jewelry tags became very painful, taking a heavy toll on my hands." AR 480-481.

On March 17, 2000, Dr. Newkirk completed a physical capacities evaluation form for Paul Revere. He indicated that plaintiff could stand 2 hours at a time, and 7 hours in a day; could walk without restrictions; could sit 1 hour at a time, and 6 hours in a day; could drive 1 hour at a time, and 4 hours in a day; could lift from waist and chest; could lift 2 pounds frequently and 25 pounds occasionally; and could use hands for simple grasping and pushing/pulling. Plaintiff was precluded from using her hands for fine manipulation or repetitive motion, and was precluded from performing overhead work. Dr. Newkirk added that plaintiff "needs absolutely correct ergonomic work station." AR 273.

9

**United States District Court**
For the Northern District of California

1    In June 2000, plaintiff submitted a supplemental APS.  Dr. Newkirk stated that he

2  had seen plaintiff on June 5, 2000, and described plaintiff's condition in terms essentially

3  identical to the descriptions in the April 28, 1999, APS and the November 8, 1999, APS.

4  Plaintiff also described the same part-time work duties as previously reported.  AR 280.

5    In December 2000, Paul Revere wrote plaintiff to request that she undergo a

6  Functional Capacity Evaluation ("FCE") with a physical therapist of Paul Revere's choice.

7  AR 309, 312.  In January of 2001, plaintiff underwent a three-hour FCE at US HealthWorks

8  in San Leandro.

9    Paul Revere/UnumProvident asked US Healthworks to assess plaintiff's functional

10  capacity, to determine whether plaintiff was able to return to work as an administrative

11  assistant, and to identify appropriate restrictions and limitations of plaintiff's occupational

12  duties.  Specifically, Paul Revere/UnumProvident asked US Healthworks to assess

13  plaintiff's "functional performance, capacity;" to describe "her maximal tolerance, including

14  frequency and duration of each activity;" to state whether "she [gave] maximum effort;" to

15  state what level of work plaintiff would be able to perform in an 8-hour day; to state what

16  specific restrictions and limitations would be appropriate; and to state which job duties

17  plaintiff was and was not capable of performing, and which of those job duties would

18  correlate with plaintiff's occupation.  See AR 310-311.

19    US Healthworks submitted its report to Paul Revere/UnumProvident on January 30,

20  2001.  See AR 321-349.  The report of the FCE stated that plaintiff "did not demonstrate

21  the ability to work as an administrative assistant," and that "[a]ny task requiring the use of

22  the upper extremities, especially gripping and fingering activities, caused [plaintiff] to report

23  the most pain and discomfort."  While the report indicated that "[o]f the tests that [she]

24  performed[,] consistent effort was demonstrated," it also stated that "force curve patterns

25  suggest submaximal effort," that plaintiff was "self-limiting during the exam and very

26  hesitant to perform most of the tasks," that "[s]ymptom magnification was observed," and

27  that "[b]ecause of self-limited performance the majority of [plaintiff's] abilities remain open

28  to conjecture."  The report also noted that plaintiff requested frequent breaks and left the

United States District Court

For the Northern District of California

1   room twice to "get air," and that she had reported lightheadedness and nausea, symptoms

2   which the evaluator considered "not associated with physiological signs of color change,

3   heart rate change, etc." AR 345-347.

4        On February 1, 2001, Dr. Newkirk signed an APS, indicating that he had seen

5   plaintiff on that date.[5]  The APS listed the following restrictions: "no data entry, typing,

6   repetitive gripping, lifting, reaching."  Dr. Newkirk described plaintiff's condition in terms

7   identical to the descriptions in the April 1999 APS and the November 1999 APS, and the

8   portion of the form completed by plaintiff described essentially the same part-time work

9   duties as in the previous submissions.  AR 356.

10        Also on February 1, 2001, plaintiff wrote the physical therapist who had performed

11   the FCE.  She stated that immediately after the testing, her arms and hands had been so

12   "traumatized" that she was unable to drive herself home.[6]  She claimed that as a result of

13   the "stress & strain" of the three-hour-long test, she had experienced increased pains and

14   was "virtually bedridden" for several days.  She stated that she went to work on "Friday,"

15   but was unable to function and had to leave early, and that she missed work on "Sunday"

16   as well.[7]  She claimed that as of February 1, 2001, she was "still feeling the adverse effects

17   _____

18        [5]  On July 17, 2000, in response to a request from Paul Revere for copies of plaintiff's
     medical records, Erika from Dr. Newkirk's office stated that Dr. Newkirk hadn't seen plaintiff
19   since 1998, and had "no records since then."  AR 287, 306.  On July 19, 2000, a Paul Revere
     representative called Dr. Newkirk's office to ask why he had been signing the supplemental
20   APSs if he hadn't seen plaintiff since 1998.  AR 287.  On July 21, 2000, Marsha from Dr.
     Newkirk's office responded that Dr. Newkirk had seen plaintiff in January 1999 and on June
21   5, 2000, and "only those times," and agreed to fax the office notes to Paul Revere.  AR 287.
     However, the notes – one page, with a cover sheet dated July 26, 2000 – reflect a single visit
22   on June 5, 2000, and carry only the following notation: "Fairly stable – still a lot of arm pain,"
     plus a recommendation for medication.  AR 288.  This suggests that Dr. Newkirk did not see
23   plaintiff in April 1999, November 1999, and February 2001, when he signed APSs for Paul
     Revere, indicating that he had seen her and was continuing treatment.

24        [6]  The record shows that plaintiff's boyfriend drove her to the FCE appointment.  Plaintiff
25   later explained, however, that if she had wanted to drive herself, she would not have been able
     to drive home because of the pain.

26        [7]  It is not clear which dates plaintiff is referring to – Friday and Sunday, January 19 and
27   21, 2001 – or Friday and Sunday, January 26 and 28, 2001.  The evaluation was apparently
     performed on January 16, 2001.  At one point, the report of the test says the date was January
28   23, 2001, but all the reports (which bear different dates) indicate that the individual tests were
     administered on January 16, 2001.

United States District Court

For the Northern District of California

1    of the Jan. 16 FCE testing."  AR 354.

2         Meanwhile, on January 31, 2001, and February 2, 2001, an investigator working for

3    Paul Revere conducted video surveillance of plaintiff.  AR 359-74.  The investigator

4    observed plaintiff using both her right and her left hand and arm to open and close the front

5    door of her Mill Valley residence, the front gate opening onto the sidewalk, and the front

6    and back doors and trunk door of her vehicle; to push a shopping cart; to place items into

7    her vehicle and remove them; to carry grocery bags and personal items; and to drive her

8    vehicle.  He also observed her walking with both arms swinging, and walking with a purse

9    hanging from her shoulder or carried in her hand.  In engaging in these activities, plaintiff

10   showed no signs of physical difficulty or discomfort.

11        On March 15, 2001, Lynnette Boothby of Paul Revere referred plaintiff's file, along

12   with the report on the FCE and the report on the video surveillance, for an internal clinical

13   review.  AR 389.  Judy Ellington, R.N., stated in her March 22, 2001, evaluation that "[a]fter

14   review of the surveillance disc, it is apparent that [restrictions and limitations] are

15   exaggerated in light of activities in which claimant participated."  She added, "I am now

16   referring this claim to Dr. McSharry for the FCE review and his responses to" the question

17   whether there appeared to be any impairment at all.  AR 387-388.

18        The file was then referred to Patrick F. McSharry, M.D., who completed his review

19   on March 26, 2001.  Dr. McSharry noted that the medical records, which were "sparse,"

20   claimed a "brachial plexus injury with dystonia of the affected limb."[8]  However, he found

21   that there did not "appear to be any objective evidence such as nerve condition studies,

22   MRIs of affected areas, etc., so I must rely on the objective evidence of the video

23   surveillance and FCE."  In his opinion, the video showed "no difficulty with fine or gross

24   motor movement of the affected arm."  He saw no evidence of any type of dystonic reaction

25   _____

26        [8] "Brachial plexus" is "[t]he network of spinal nerves (from the lower neck and upper
     shoulder) that supply the arm, forearm, and hand with movement and sensation. Located in
27   the neck-shoulder region."  In a brachial plexopathy, the mechanical factors (pressure) may
     be complicated by ischemia (lack of oxygen caused by decreased blood flow) in the area." All-
28   Refer.com, located at http://health.allrefer.com.

United States District Court

For the Northern District of California

1  akin to "writer's cramp" during the video.  He also found the FCE to be "inconsistent with

2  this type of dystonia."  He noted that while plaintiff had performed "consistently," there was

3  "evidence of both submaximal effort and symptom magnification," a type of performance

4  more "associated with psychological disturbance . . . than [with] physical diseases such as

5  dystonia and brachial plexus injury."  AR 387.

6      Dr. McSharry concluded, "There is no evidence of any physical impairment in the

7  record I was asked to review."  He noted, however, that there appeared to be very few

8  medical records available.  He indicated that "Dr. Newkirk's consultation records and any

9  psychological or psychiatric records would also be useful if the claimant wishes to dispute

10  the FCE and video-surveillance findings."  AR 387.

11      On March 28, 2001, Ms. Boothby notified plaintiff that Paul Revere/UnumProvident

12  was terminating her benefits because she did not meet the definition of disability from her

13  occupation as laid out in the group plan.  The letter of notification stated that there was no

14  objective evidence of an impairment to show that plaintiff was unable to perform the

15  important duties of her own occupation of administrative assistant, and also noted a

16  number of contradictions between plaintiff's claims of disability and the other evidence.

17  AR 394-396.

18      First, Ms. Boothby stated that while the restrictions and limitations listed on the

19  periodic supplementary statements submitted by plaintiff's physician included "no data

20  entry, typing, repetitive gripping, lifting or reaching," Paul Revere's video observation of

21  plaintiff showed her lifting items of various weights and reaching on several different

22  occasions, and also showed her swinging her arms while taking an hour-long walk in her

23  neighborhood.  During those activities, she showed no sign of pain.  AR 396.

24      Second, Ms. Boothby noted that according to the FCE report, plaintiff showed

25  symptom magnification on many of the tests, and reportedly had to end many of the tests

26  due to pain, light-headedness, and nausea, yet those self-reports were not accompanied by

27  physiological signs such as color change or change in heart rate.  AR 395.

28      Third, Ms. Boothby pointed to the discrepancy between plaintiff's February 1, 2001,

United States District Court

For the Northern District of California

1  complaint that she had been so traumatized after the FCE that she could not drive herself

2  home, and the report indicating that her boyfriend had driven her to the test; and the

3  discrepancy between her statement that she had been "virtually bedridden for several

4  days," and was still feeling the effects of the FCE as of February 1, and the video

5  surveillance that showed her active and driving an automobile for extended periods on

6  January 31 and  February 2.  AR 395.

7       Fourth, Ms. Boothby asserted that Paul Revere's review of the information provided

8  by Dr. Newkirk, compared with the FCE results and the video surveillance, showed that the

9  restrictions and limitations provided by Dr. Newkirk were exaggerated in light of plaintiff's

10  observed activities.  Ms. Boothby also noted that plaintiff's file contained no reports of

11  objective tests to medically support the level of restrictions or limitations that plaintiff and

12  Dr. Newkirk were reporting.  AR 395.

13       On June 25, 2001, plaintiff's attorney wrote a letter to UnumProvident requesting

14  review of the decision to terminate benefits.  He requested a copy of the claim file and

15  other documentation such as claims manuals and documents relating to claims handling.

16  On July 18, 2001, Jeanne Callaway, Senior Appeals Specialist at UnumProvident,

17  forwarded a copy of the documents upon which the denial of benefits was based, and also

18  advised that UnumProvident would hold the record open until August 27, 2001, to allow

19  plaintiff to supplement the claim with any additional information.  AR 422-423.

20       On August 27, 2001, UnumProvident wrote plaintiff's attorney to say that as plaintiff

21  had submitted no new information, UnumProvident would begin processing the review of

22  the appeal.  AR 435.  Plaintiff's attorney responded the same day, stating that he was still

23  gathering information, and anticipated completing the process in 30 days.  He stated that

24  he had not received the claim file until July 25, 2001, and that he had not received the

25  surveillance video tape until after that date.  He asserted that UnumProvident should allow

26  plaintiff additional time to submit evidence, and added that he considered that the period for

27  UnumProvident to make its decision did not commence until plaintiff had completed her

28  submissions.  He requested that UnumProvident not make a decision until the end of

14

United States District Court

For the Northern District of California

1   September 2001.  AR 438-439.

2       On August 28, 2001, UnumProvident wrote plaintiff's attorney to say that the review

3   of the file had been completed, and that the decision to uphold denial of benefits would

4   stand.  The letter reiterated the findings and conclusions in the March 28, 2001, letter of

5   denial – the absence of clinical findings and diagnostic testing from a treating physician, the

6   evidence showing symptom exaggeration, and the conflict between the

7   restrictions/limitations and plaintiff's observed and reported activities.  The letter also

8   stated, however, in response to plaintiff's request that UnumProvident not make a decision

9   until the end of September 2001, that UnumProvident would consider any additional

10  information submitted by plaintiff prior to October 1, 2001.  AR 441-443.

11      Plaintiff responded to the denial of the claim with a letter written for her by her father.

12  She stated that she was able to carry light weights "so long as I'm not doing it for long

13  periods repetitively."  She stated further, "When I shop, I make sure my bags are light."

14  She claimed that the reason she made four trips between her car and her residence was to

15  avoid carrying too much weight at once.  She claimed that she was unable to do "repetitive

16  motions such as data entry" for other than small amounts of time.  She asserted, "I often

17  feel pain in my fingers, hands, and arms when carrying things" but that "I try not to show

18  the pain by grimacing or otherwise," that the pain "is something I have learned to live with,"

19  and that "I use ice packs, heating pads, anti-inflammatory and analgesic medications on a

20  daily basis to try to help control the pain."  AR 483-484.

21      Plaintiff's mother wrote a letter to Paul Revere dated September 3, 2001, to describe

22  how her daughter's life had changed since the onset of her disability.  AR 456-457.  Plaintiff

23  herself wrote another letter to Paul Revere dated September 8, 2001, summarizing her

24  work history, medical history, and physical condition from 1993 to the present.  AR 458-

25  459.  On October 1, 2001, plaintiff's attorney wrote a letter to Paul Revere, asserting that

26  the termination of benefits was not supported, and recapping the appeals process.  The two

27  letters from plaintiff and the letter from plaintiff's mother were included in the record as

28  "additional evidence."  AR 463-470.

1      On October 26, 2001, Dr. Newkirk wrote plaintiff's attorney a letter, apparently in

2   response to a letter of inquiry regarding plaintiff's status.  AR 493-498.  In the letter, Dr.

3   Newkirk offered his opinion that plaintiff was totally disabled from the usual duties of her

4   occupation.  He also attacked the validity and relevance of the surveillance videos, the

5   FCE,  the medical personnel who reviewed plaintiff's claim for Paul Revere, as well as Paul

6   Revere itself and the disability insurance industry in general.

7      Dr. Newkirk stated that plaintiff is "definitely not able to perform the duties of an

8   administrative assistant on a full or a part time basis" and that "[s]he has not been able to

9   perform these duties at any time since 1997."  He stated further that plaintiff's "disabling

10  problem is compression of the brachial plexus and easily observed focal acquired limb

11  dystonia."  According to Dr. Newkirk, this condition "becomes triggered, analogous to

12  writer's cramp, as soon as she begins to use her hands in a position that would be

13  consistent with typing, desk work, or even working in a kitchen."  He added that plaintiff

14  "has not been able to perform these duties at any time since 1997," and that "[t]he nature of

15  the injury will probably disable her from this type of work for the rest of her life."  AR 498.

16     Dr. Newkirk also asserted that the surveillance videos did not support denial of

17  plaintiff's claim, as there was not sufficient detail in the videos to show exactly how

18  plaintiff's hands were positioned; and the body positions required to "move within the

19  purview of the surveillance video tapes" were "neutral" body positions that would not trigger

20  dystonia.  AR 498.

21     Dr. Newkirk stated that the objective disorders manifested by plaintiff would be

22  "objectively demonstrable" under two sets of circumstances – in a combined MRI/MRA,

23  which could be performed by only one radiologist in California (a Dr. Douglas Collins at

24  UCLA); and by "unprejudiced observation" – apparently referring to Dr. Newkirk's own

25  observation of plaintiff, whom he claimed usually sits with her hands in a "cupped" or

26  "closed" position.  He asserted that plaintiff "continues to have these physical findings up to

27  the present time," and that "[i]t would require a very unskilled observer to miss this fact.  AR

28  497.

United States District Court
For the Northern District of California

United States District Court

For the Northern District of California

1    Dr. Newkirk argued that the FCE should "never be allowed to serve as evidence

2  regarding [plaintiff's] capacity," as plaintiff obviously chose to self-limit during the tests in

3  order to avoid further injury.  He contended that the physical therapists should also have

4  contacted plaintiff the day following the test to check on residual effects, and asserted that

5  the physical therapist evaluators were not only unqualified to assess the psychologic

6  aspects of the evaluation, but were also unqualified to recognize, evaluate, or

7  accommodate focal acquired limb dystonia.  He referred to the FCE as a "pseudo-test," and

8  recommended that the results be totally discarded.  AR 496.

9    He also asserted that the medical department at UnumProvident came to "equally

10 nonsensical and biased conclusions," for which there were no basis in fact.  He stated that

11 he had seen plaintiff more than 30 times over the years, and claimed to know "with

12 absolute certainty" that she not only had ischemia of the brachial plexus, but also had

13 acquired focal limb dystonia.  He found it "more than a little insulting" that "unskilled

14 observers" could provide an opinion that is "simply a facade for negative attitude," with no

15 "merit or organic basis whatsoever."  AR 496.

16    He asserted that plaintiff's thoracic outlet syndrome is a condition in which "patients

17 have negative plain film, negative plain MRIs, and negative electrical studies, yet have

18 neurologic symptoms that are often most prominent in one or both upper extremities," and

19 may include "lightheadedness, blurred vision, nausea, pressure in the face," and

20 "numerous other symptoms.  AR 495.

21    He concluded that the examination (presumably referring to the FCE) and

22 conclusions that resulted from it were "ludicrous, and totally without merit."  He again

23 referred to his exasperation with "pseudo-tests being performed badly, without followup,

24 and with unbelievable extrapolation, all colored by negative attitudes on the part of the

25 evaluator, and a clear-cut lack of experience and understanding of the underlying

26 physiologic conditions that create the condition in the first place."  AR 494.

27    Finally, he claimed that Paul Revere seemed "to have some fascination with lack of

28 treatment in the last couple of years."  He asserted that plaintiff had tried to go out on her

17

United States District Court

For the Northern District of California

1    own and make a living, "which she cannot do," and submitted that the reason there had

2    been no treatment was that "the definitive studies necessary to make a diagnosis and treat

3    her have been denied by any of the involved insurance carriers," launching into another

4    attack on the insurance industry.  AR 494.  On October 31, 2001, plaintiff's attorney

5    forwarded the letter from Dr. Newkirk to Paul Revere.  AR 499.

6        In December 2001, Paul Revere referred plaintiff's file for internal review by David

7    Frank, PT, MS., with directions to pose the appropriate questions to Paul Revere's own

8    medical doctor to determine whether, based on the prior information and the additional

9    information submitted on appeal, plaintiff did or did not have the restrictions and limitations

10   of "no working" from March 1, 2001, to the date of the review.

11       Mr. Frank summarized the information in plaintiff's file – the reports by Dr. Newkirk

12   to Kemper, from May 1997 to December 1997, and the reports of physical therapy during

13   the same period; the report of plaintiff's June 2000 visit to Dr. Newkirk (the last time he saw

14   plaintiff); the October 2001 letter from Dr. Newkirk to plaintiff's attorney; the report of the

15   January 2001 FCE; and the report of the February 2001 video surveillance.  Mr. Frank

16   concluded that there was "little medical information of clinical assessments or diagnostic

17   testing identified in the file;" that the functional abilities demonstrated in the video

18   surveillance did appear to support ability to perform work involving the upper extremities;

19   and that there might be appropriate restrictions and limitations, but it was not clear from the

20   file what they might be.  AR 520-523.

21       Following completion of Mr. Frank's review, Paul Revere referred the file to its

22   Board-certified neurologist, Alan Neuren, M.D.  Paul Revere asked Dr. Neuren to consider

23   whether the additional information provided changed the opinion of the March 22, 2001,

24   medical review; whether the presented diagnoses were supported by clinical assessments

25   and diagnostic testing contained in the file; whether the functional activities demonstrated in

26   the FCE were consistent with the presented medical information and the demonstrated

27   physical abilities contained in the claim file; and whether symptomology from the presented

28   diagnoses would be evident in the observed functional activities.  AR 520.

United States District Court

For the Northern District of California

1    Dr. Neuren completed his review on January 3, 2002.  He reported that the new

2   evidence did not provide any information that would support the claim.  In particular, he

3   noted that there was nothing in the file to indicate that Dr. Newkirk ever examined plaintiff –

4   no assessment of the motor, sensory, or vascular supply to the extremities – and that

5   essentially the file consisted of reports of plaintiff's description of her symptoms.  He also

6   noted there were no studies performed, such as radiographs, electrodiagnostics, or

7   vascular studies to assess for thoracic outlet syndrome, and that there was no effort made

8   to consider another possible cause, such as disk disease or carpal tunnel syndrome (both

9   of which Dr. Neuren considered more common than thoracic outlet syndrome).  AR 525-

10   526.

11    With regard to the video surveillance, and Dr. Newkirk's comment that the position of

12   plaintiff's hands was "neutral" in all the observed activities, Dr. Neuren noted that the

13   position of the arms required to operate a motor vehicle is far less "neutral" than the

14   position required to operate a word processor.  He took issue with Dr. Newkirk's

15   characterization of the limb dystonia as "secondary" to brachial plexus ischemia –

16   describing it as a "novel theory of dystonia that is not supported by the literature."  He also

17   disputed Dr. Newkirk's claim that the vascular studies necessary to document the condition

18   of thoracic outlet syndrome are available at only one location in California, asserting that

19   the ability to diagnose arterial or venous thoracic outlet can be done in most hospitals

20   capable of doing vascular studies.  He asserted – contrary to Dr. Newkirk's opinion that

21   electrical studies will not demonstrate brachial plexus ischemia or compression – that any

22   injury significant enough to cause disabling symptoms to the brachial plexus should readily

23   be demonstrable by electrodiagnostic studies.  AR 526.  He explained the differences

24   between neurological thoracic outlet syndrome and vascular thoracic outlet syndrome, in

25   terms of causes and demonstration by clinical findings, and disputed Dr. Newkirk's

26   contentions regarding the frequency of incidence of neurogenic thoracic outlet syndrome.

27   AR 525.

28    Finally, Dr. Neuren questioned the validity of Dr. Newkirk's assessment of the FCE,

19

**United States District Court**
For the Northern District of California

1   asserting that there is no mechanism by which a dystonia will be permanently worsened by

2   provocative testing.  After noting that Dr. Newkirk had observed that plaintiff's symptoms

3   would be worsened by performing tasks with the arms placed in front of the body, Dr.

4   Neuren pointed out that the surveillance video showed plaintiff driving with no difficulty,

5   which requires the arms to be positioned in front of the body.  He also found that plaintiff's

6   complaints about her increased symptomology in the days following the FCE were

7   obviously not supported by her behavior when under surveillance during the same period.

8   He concluded that plaintiff's subjective complaints were not confirmed by objective findings,

9   and also were not supported by her observed behavior.  AR 525.

10                                              **DISCUSSION**

11  A.      Legal Standard

12          A challenge to an ERISA plan's denial of benefits is reviewed de novo unless the

13  plan gives the administrator or fiduciary discretionary authority to determine eligibility for

14  benefits of to construe the terms of the plan.  See Aetna Health, Inc. v. Davila, 542 U.S.

15  200, 210 (2004); Johnson v. Buckley, 356 F.3d 1067, 1075 (9th Cir. 2004).  When such

16  discretion exists, the district court reviews the administrator's determinations for an abuse

17  of discretion.  See Jebian v. Hewlett Packard Co. Employee Benefits Organization Income

18  Protection Plan, 349 F.3d 1098, 1102-03 (9th Cir. 2003).  This standard is the same as

19  "arbitrary and capricious."  Id.; see also Tremain v. Bell Indus., Inc., 196 F.3d 970, 975 n.5

20  (9th Cir. 1999).  The "abuse of discretion" standard may be heightened by the presence of

21  a serious conflict of interest by the plan administrator.  Alford v. DCH Found. Group Long

22  Term Disability Plan, 311 F.3d 955, 957 (9th Cir. 2002).

23          The court previously ruled that the standard of review in the present case is abuse of

24  discretion.  See Order Granting Request to Establish that Standard of Review is Abuse of

25  Discretion, filed Apr. 11, 2005; see also Order Denying Request to Allow Discovery, filed

26  Oct. 19, 2005.  Ordinarily, summary judgment is appropriate if there is no genuine issue as

27  to any material fact and the moving party is entitled to judgment as a matter of law.  Fed. R.

28  Civ. P. 56(c).  In ERISA actions, however, where the plaintiff is challenging the plan

                                                    20

**United States District Court**
For the Northern District of California

1    administrator's denial of benefits and the district court has already determined that the

2    abuse of discretion standard of review applies, "a motion for summary judgment is merely

3    the conduit to bring the legal question before the district court and the usual tests of

4    summary judgment, such as whether a genuine dispute of material fact exists, do not

5    apply." Bendixen v. Standard Ins. Co., 185 F.3d 939, 942 (9th Cir. 1999).

6         Under the abuse of discretion standard, the issue before the court is not whether

7    Paul Revere reached the "correct" decision; the issue is whether there is substantial

8    evidence in the record to support Paul Revere's decision. Snow v. Standard Ins. Co., 87

9    F.3d 327, 331-32 (9th Cir. 1996) (abuse of discretion standard does not permit overturning

10   of decision where there is "substantial evidence" to support decision – that is, where there

11   is relevant evidence that reasonable minds might accept as adequate to support conclusion

12   even if it is possible to draw two inconsistent conclusions from evidence), overruled on

13   other grounds, Kearny v. Standard Ins. Co., 175 F.3d 1084 (9th Cir. 1999). Even decisions

14   directly contrary to evidence in the record may not necessarily amount to an abuse of

15   discretion. Taft v. Equitable Life Assur. Soc., 9 F.3d 1469, 1473 (9th Cir. 1993).

16        An ERISA administrator abuses its discretion only if it renders a decision without

17   explanation, construes provisions of the plan in a way that conflicts with the plain language

18   of the plan, or relies on clearly erroneous findings of fact. Bendixen, 185 F.3d at 944;

19   Atwood v. Newmont Gold Co., 45 F.3d 1317, 1323-24 (9th Cir. 1995). The district court

20   should uphold the decision of an ERISA plan administrator "if it is based upon a reasonable

21   interpretation of the plan's terms and was made in good faith." Boyd v. Bert Bell/Pete

22   Rozelle NFL Players Retirement Plan, 410 F.3d 1173, 1178 (9th Cir. 2005) (quotations and

23   citations omitted). The court may not substitute its judgment for that of the administrator

24   unless the latter's decision was clearly erroneous in light of the available record, or there

25   was no reasonable basis for it. Bendixen, 185 F.3d at 944.

26   B.    Defendants' Motion

27        Defendants now move for summary judgment, arguing that the claims administrator,

28   Paul Revere, did not abuse its discretion in determining that plaintiff is no longer entitled to

United States District Court

For the Northern District of California

long-term disability benefits under a group disability policy issued by Paul Revere. Defendants argue that the medical evidence contains no medical findings that support the existence of a disability, that plaintiffs' activities are inconsistent with her complaints of pain, and that there is evidence that she has misstated and overstated her complaints of pain. Defendants assert further that there is no evidence that Paul Revere's decision was motivated by a conflict of interest caused by its dual role as insurer and claims administrator.

First, defendants assert that the clinical findings in the record do not support a claim of disability.  They argue that the medical records do not reflect the results of physical examination or diagnostic testing, despite the fact that the injuries and illnesses that are the purported cause of plaintiff's disability – thoracic outlet syndrome, acquired dystonia, and ischemia of the brachial plexus – can be established through physical examination findings and diagnostic test results.  Defendants assert that rather than provide medical evidence, plaintiff has simply relied on conclusory statements by Dr. Newkirk.

Defendants note, however, that Dr. Newkirk made statements in his October 2001 report about plaintiff's condition as of that date, even though he had not seen her since June 2000.  They claim in addition that the statements that plaintiff was not able to perform the duties of an administrative assistant and had not been able to do so at any time since 1997 contradicted his prior statements that plaintiff would be able to return to work. Defendants also assert that Dr. Newkirk failed to explain why plaintiff, with such supposedly severe limitations, could still undertake numerous strenuous upper extremity activities. Defendants contend that the physicians who reviewed the claim for Paul Revere – most notably Dr. Neuren – provide specific and detailed analysis that establishes why Dr. Newkirk is incorrect in his opinion and why the evidence in the administrative record does not support the existence of a disability.

Second, defendants contend that plaintiff's claims regarding her symptoms are in conflict with the evidence regarding her activities.  They note that plaintiff was able to work at Restoration Hardware, at Nordstrom, and at an art gallery during the time she was

United States District Court
For the Northern District of California

1  supposedly too disabled to work, and that she was able to lift light weights for exercise, a

2  far more strenuous upper extremity activity than the activities performed at her job at

3  Sazevich.

4      Defendants point out that by her own admission plaintiff was able to stock shelves,

5  work on a cash register, and do some data entry.  They argue that Dr. Newkirk's limitations

6  of no "typing [or] repetitive gripping, lifting, or reaching" are contradicted by plaintiff's ability

7  to perform these activities.  Defendants also contend that plaintiff's report to the FCE

8  examiner, that "[a]ny task requiring use of the upper extremities, especially gripping and

9  fingering activities," caused her to report the most pain and discomfort is contradicted by

10  these activities.  Defendants argue that these activities, combined with the absence of

11  medical findings, combined with the complete absence of treatment, is enough to provide a

12  reasonable basis for Paul Revere's decision.

13      Defendants argue in addition that Paul Revere has evidence that directly contradicts

14  plaintiff's complaints of pain.  Specifically, at a time when plaintiff claimed she was still

15  experiencing after-effects from the FCE, and that she was virtually bedridden, she was

16  filmed on the surveillance video engaging in various activities such as driving an

17  automobile and shopping for groceries, without any evidence of pain.

18      In a third and related argument, defendants contend that the evidence shows that

19  plaintiff has exaggerated or magnified her symptoms.  They note that the FCE evaluator

20  reported that plaintiff was "self-limiting during the exam and very hesitant to perform most

21  of the tasks" and that "symptom magnification was observed;" that plaintiff reported a need

22  for frequent breaks, and left the room twice to "get air;" that most of plaintiff's complaints

23  involved reports of light-headedness and nausea, which reported symptoms were not

24  accompanied by physiological signs of color change or heart rate change; that plaintiff

25  failed to complete a number of the tests; and that any task requiring the use of the upper

26  extremities, especially gripping and fingering activities, caused plaintiff to report the most

27  pain.  They also note the FCE's evaluator's conclusion – that "[b]ecause of self-limited

28  performance, the majority of [plaintiff's] abilities remain left to conjecture," and that

United States District Court
For the Northern District of California

1   successful return to work would be limited "unless the non-organic component of her

2   problem is addressed."

3        Defendants assert that this report from the FCE evaluator, combined with the video

4   surveillance showing plaintiff walking, swinging both arms, driving an automobile, pushing a

5   shopping cart and shopping for groceries, loading items into the trunk and back seat of the

6   car, and retrieving items from the trunk and back seat, all with no apparent discomfort,

7   establish that plaintiff exaggerated her symptoms.  Defendants also note that the video

8   shows plaintiff functioning normally at a time when she was reporting to the FCE evaluator

9   that she was still feeling adverse effects from the FCE, symptoms purportedly so severe

10  that they left her bedridden.

11       Finally, defendants contend that there is no evidence that Paul Revere's decision

12  was motivated by a conflict of interest in its dual role as claims administrator and insurer.

13  They claim that there is no material, probative evidence, beyond the mere fact of the

14  apparent conflict, tending to show that Paul Revere's self-interest caused a breach of its

15  fiduciary duty to the plaintiff.  Defendants assert that plaintiff is a young person who claims

16  she is permanently precluded from a job that involves filing, answering the phone, and

17  working at a keyboard – but who provides no physical examination results or diagnostic

18  studies in support of this claim, even though tests are available to determine the existence

19  of this purportedly disabling condition, and who is not receiving any treatment for the

20  alleged condition.

21       Plaintiff opposes the motion, arguing that the termination of benefits was improper.

22  She claims that she submitted ample evidence that she could no longer work at her

23  occupation, that Paul Revere's explanation for the denial of benefits is not persuasive, and

24  that the termination of her claim should be reviewed de novo because of Paul Revere's

25  conflict of interest.

26       In response to defendants' argument that Dr. Newkirk's conclusions were not

27  supported by clinical findings or objective diagnostic tests, plaintiff argues that the policy

28  does not require objective proof of a disabling condition, and that nothing in the file

24

United States District Court
For the Northern District of California

1   establishes that a reliable diagnosis could not be made without the various tests discussed

2   by Dr. Neuren in his evaluation of plaintiff's claim.  Plaintiff claims that Paul Revere

3   arbitrarily rejected the opinions of plaintiff's treating physician; and has wrongfully insisted

4   on objective evidence.

5   Plaintiff asserts nonetheless that Dr. Newkirk's diagnosis was based on objective

6   observations, citing to the October 26, 2001, letter, in which Dr. Newkirk stated that the two

7   types of disorders manifested by plaintiff – compression of blood supply to brachial plexus,

8   and acquired limb dystonia – are objectively demonstrable under two circumstances – in a

9   combined MRI/MRA as performed by Dr. Collins at UCLA, and in "unprejudiced

10   observation."

11   Plaintiff also argues that the claim that Dr. Newkirk's conclusions were not supported

12   by examinations of plaintiff ignores the evidence – specifically, Dr. Newkirk's numerous

13   reports to the worker's compensation carrier, and his exam notes on November 12, 1997 –

14   reflecting the more than 30 times that Dr. Newkirk saw plaintiff.  Plaintiff claims that the fact

15   that Dr. Newkirk did not consider other potential causes of plaintiff's symptoms, such as

16   disk disease or carpel tunnel syndrome, is not significant because there is no requirement

17   that a treating physician's records show that he has considered every possible diagnosis.

18   Plaintiff asserts that it was Paul Revere that failed to provide adequate medical proof that

19   plaintiff was not disabled, by failing to obtain an independent medical examination (IME).

20   Second, with regard to the argument that plaintiff's claims conflict with the evidence

21   of her activities, plaintiff responds that her reported activities do not show that she can work

22   full-time as an administrative assistant; that the FCE does not establish her ability to work

23   as an administrative assistant; and that the activities shown on the video are not

24   inconsistent with a finding of disability and do not show that she can work as an

25   administrative assistant.

26   Third, with regard to defendants' claim that the evidence shows that plaintiff

27   magnified or exaggerated her symptoms, plaintiff notes that the FCE evaluator stated that

28   the evaluation did not establish that she was able to work.  She also argues that the

United States District Court
For the Northern District of California

1   physical therapist was not qualified to render psychological opinions; that the FCE does not

2   explain what is meant by "symptom magnification" or "submaximal effort;" that there is no

3   factual basis in the FCE for a conclusion that plaintiff magnified her symptoms; and that the

4   video surveillance produced so brief and limited a record that it is useless as an indicator of

5   what plaintiff can and cannot do.

6       The court finds that the motion must be GRANTED.  The issue for the court is

7   whether Paul Revere abused its discretion in finding that plaintiff was not eligible for

8   benefits under the policy.  Paul Revere did not render its decision without explanation, did

9   not construe provisions of the plan in a way that conflicts with the plain language of plan,

10  and did not rely on clearly erroneous findings of fact in making the determination to

11  terminate benefits.  See Bendixen, 185 F.3d at 944; Atwood, 45 F.3d at 1323-24.  Rather,

12  Paul Revere reasonably concluded that plaintiff had not established that she could not

13  return to her occupation, based on the lack of objective medical findings in the record, and

14  based on the conflict between plaintiff's reported symptoms on the one hand, and the

15  evidence of plaintiff's activities and functional capacity on the other.

16      In arguing that Paul Revere abused its discretion by terminating benefits without

17  ordering an IME, plaintiff suggests that it was Paul Revere's burden to show the existence

18  of a disability as defined in the policy.  However, the policy clearly places the burden of

19  proof in establishing disability on the claimant.  The policy requires the claimant to first

20  provide written notice of intent to file a claim, then to complete the "Proof of Loss" form and

21  submit it within 15 days of providing written notice.  The policy states that "[w]ritten proof

22  should establish facts about the claim such as occurrence, nature and extent of the

23  Disability involved," and that "[a]ny accrued benefits payable are subject to Our receiving

24  proof of loss."

25      Similarly, plaintiff's argument that Paul Revere was required to arrange for her to

26  visit Los Angeles to obtain an MRI/MRA from Dr. Collins – which Dr. Newkirk claimed was

27  the single method available for confirming his diagnosis – or some other type of

28  neurological evaluation is without merit, as it was plaintiff's responsibility to provide Paul

26

Revere with medical evidence supporting her claim of disability.  Once Paul Revere had a

reasonable basis for denying the claim – as it did here – Paul Revere had no obligation to

seek out medical evidence that unambiguously established that plaintiff was not disabled,

as it is plaintiff's burden to provide evidence showing that she is entitled to disability

benefits under the Plan.  Nor was Paul Revere required to accept Dr. Newkirk's opinion

without question, simply because he is the physician who treated plaintiff.  Paul Revere

cannot ignore Dr. Newkirk's medical findings without any explanation, but is not obligated to

accept them if it can establish a reasonable basis for doing otherwise.

Paul Revere clearly explained its reason for finding that plaintiff was not "disabled"

under the policy – that there are no clinical findings or diagnostic tests in the record that

support a finding of disability.  The sicknesses and injuries reported by plaintiff – thoracic

outlet syndrome, acquired dystonia, and ischemia of the brachial plexus – are of the type

that can be established through physical examination findings and diagnostic test results.

As Dr. Neuren, a board certified neurologist, stated, "All of these conditions will have readily

demonstrable findings on clinical as well as diagnostic studies."  AR 525.  However, there

are no such clinical findings or diagnostic studies shown in the medical records from Dr.

Newkirk.

Despite being given the opportunity to do so by Paul Revere, plaintiff did not provide

any such evidence.  In the August 28, 2001, letter denying plaintiff's claim, Paul Revere

stated that its in-house medical department had noted the absence of any clinical findings

and/or treatment.  In addition, Paul Revere stated that UnumProvident would consider any

further information submitted by plaintiff prior to October 1, 2001.  This was a clear

invitation for plaintiff to submit additional medical evidence, yet plaintiff did not do so.  The

only additional medical "evidence" submitted by plaintiff was Dr. Newkirk's October 26,

2001, letter to plaintiff's counsel, which included no clinical findings or diagnostic studies.

Moreover, although Dr. Newkirk stated in that letter that plaintiff "continues to have these

physical findings up to the present time," the evidence shows that he had not even seen

her since June 2000.  Thus, he had no basis for providing an opinion as to her condition in

United States District Court
For the Northern District of California

United States District Court

For the Northern District of California

1    October 2001.[9]

2        Dr. Newkirk claimed in the October 2001 letter that patients with thoracic outlet

3    syndrome will have "negative plain films, negative plain MRIs, and negative electrical

4    studies," yet will have symptoms such as "light-headedness, blurred vision, nausea,

5    pressure in the face, as well as numerous other symptoms."  However, this is the first

6    mention of these symptoms (other than as reported by plaintiff during the FCE), and, as

7    with plaintiff's other reported symptoms, there are no substantiating clinical findings or

8    diagnostic studies.

9        There is no indication in the record that Dr. Newkirk based his diagnosis on anything

10   other than plaintiff's subjective complaints, but the restrictions and limitations he imposed

11   on plaintiff do not appear valid in light of the activities plaintiff was able to engage in.

12   Moreover, plaintiff's subjective complaints – the sole basis for the disability claim – are not

13   credible because there is evidence, taken together, which indicates that she exaggerated

14   or magnified her symptoms.

15       Paul Revere also reasonably concluded that Dr. Newkirk's opinions were

16   contradicted by plaintiff's activities.  For example, Dr. Newkirk stated that plaintiff's dystonia

17   was triggered by any use of her hands in a position consistent with typing, desk work, or

18   working in a kitchen, and also stated that performing tasks in front of the body would

19   immediately create an aggravation of the dystonia.  However, plaintiff's activities (lifting light

20   weights, working on a cash register, typing while employed at Restoration Hardware, doing

21   data entry while employed at Alexandria Gallery) show no such apparent immediate

22   aggravation.

23       Dr. Newkirk's opinions were also in conflict with the evidence from the surveillance

24   video.  As Dr. Neuren noted, driving an automobile requires placement of the arms and

25

26        [9]  An additional contradiction is reflected by the fact that Dr. Newkirk consistently
27   reported to plaintiff's worker's compensation carrier in 1997 that plaintiff would be able to return
     to work at some time in the near future.  See AR 139, 141, 143, 147, 152, and 167.  Yet in
28   October 2001 – without any explanation – he claimed that she had been totally disabled from
     her occupation since 1997.

United States District Court

For the Northern District of California

1   hands in front of the body – the very activity that Dr. Newkirk claimed would provoke

2   dystonia.  The surveillance video, in conjunction with plaintiff's letter of February 1, 2001, to

3   the FEC physical therapist, also indicate that plaintiff was magnifying her symptoms.  She

4   was supposedly bed-ridden after the FCE, and was still feeling the "adverse effects" of the

5   testing on February 1, the same day that she was observed walking, using a key to unlock

6   doors, driving an automobile, pushing a shopping cart, raising and lowering the trunk lid,

7   and lifting bags in and out of the car.

8          With regard to the FCE, Paul Revere reasonably concluded that the physical

9   therapists at US Healthworks were qualified to interpret the test results.  While plaintiff

10  complained of the most pain with any task involving the use of the upper extremities, she

11  was observed soon afterwards performing such tasks without difficulty.  Although plaintiff

12  argues that the FCE did not establish her ability to work, the court notes that the FCE

13  report actually stated that plaintiff "does not demonstrate the ability to work as an

14  administrative assistant" – a comment on plaintiff's "demonstrated" abilities, not on her

15  actual ability to work.  The report then went on to state why plaintiff's demonstrated abilities

16  were not valid, including the fact that there was symptom magnification and a self-limiting

17  performance.

18                                    **CONCLUSION**

19         In accordance with the foregoing, the court hereby GRANTS defendants' motion for

20  summary judgment.  Where, as here, the insurance policy is both issued and administered

21  by the defendant, there is an apparent conflict of interest.  Bendixen, 185 F.3d at 943.

22  Such apparent conflict, however, is not enough by itself to establish a serious conflict

23  warranting de novo review.  Jordan v. Northrop Grumman Corp. Welfare Benefit Plan, 370

24  F.3d 869, 876 (9th Cir. 2004).  To establish a serious conflict that would justify de novo

25  review despite a conferral of discretion, the beneficiary has the burden to come forward

26  with "material, probative evidence, beyond the mere fact of the apparent conflict, tending to

27  show that the fiduciary's self-interest caused a breach of the administrator's fiduciary

28  obligations to the beneficiary."  Alford, 311 F.3d at 957; see also Hensley v. Northwest

**United States District Court**
For the Northern District of California

1  Permanente P.C. Ret. Plan & Trust, 258 F.3d 986, 994-95 & n.5.  If the beneficiary cannot

2  satisfy this burden, the district court must apply the traditional abuse of discretion review.

3  Hensley, 258 F.3d at 995; Atwood, 45 F.3d at 1323.[10]

4         Plaintiff in this case has not met her burden of providing material probative evidence,

5  apart from the mere fact of the apparent conflict, showing that Paul Revere's self-interest

6  caused a breach of its obligations to plaintiff.  See Nord v. Black & Decker Disability Plan,

7  356 F.3d 1008, 1010 (9th Cir. 2004) (material, probative evidence consists of, e.g.,

8  inconsistencies in administrator's reasons, insufficiency of those reasons, or procedural

9  irregularities in processing of beneficiary's claim).  Accordingly, the court is required to give

10  significant deference to Paul Revere's decision, and may not substitute its judgment for the

11  judgment of the administrator.  Bendixen, 185 F.3d at 944.

12         Paul Revere has provided a reasonable basis for its decision, and the court

13  therefore cannot say that Paul Revere abused its discretion.  The record reflects no

14  substantive evidence of disability – no physical examinations and no objective diagnostic

15  tests.  Paul Revere's decision that plaintiff was not disabled under the policy definition was

16  not an abuse of discretion because it was reasonable and supported by substantial

17  evidence in the administrative record as a whole.  See McKenzie v. General Tel. Co. of

18  Cal., 41 F.3d 1310, 1316-17 (9th Cir. 1994).  In view of plaintiff's failure to provide evidence

19  of disability, Paul Revere was under no obligation to provide an independent medical

20  examiner to conduct an actual physical examination.[11]

21         Plaintiff has not established that Paul Revere abused its discretion in determining

22  that she did not meet the definition of "disabled" under the policy.  Nor has she shown that

23  _____

24         [10]  At the hearing on the motion, plaintiff's counsel argued that under Evans v.
       UnumProvident Corp., 434 F.3d 866 (6th Cir. 2006), an opinion issued by the Sixth Circuit two
25       days after plaintiff filed the opposition brief, the court is required to consider the apparent
       conflict as a factor, even where the court has determined that the appropriate standard is
26       abuse of discretion.  As indicated above, this is not the standard employed in the Ninth Circuit.

27         [11]  Evans is distinguishable from the present case on this basis, as the Sixth Circuit
       found that the administrator had "ignored reliable medical evidence proffered by plaintiff."  See
28       Evans, 434 F.3d at 879.

1  Paul Revere construed any provisions of the plan in a way that conflicts with the plain

2  language of the plan, or relied on clearly erroneous findings of fact in making the benefit

3  determinations at issue.

4

5  **IT IS SO ORDERED.**

6  Dated: April 25, 2006

7  _____
   PHYLLIS J. HAMILTON
8  United States District Judge

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

**United States District Court**
For the Northern District of California

31